COREY R. WEBER - Bar No. 205912
RYAN F. COY – Bar No. 324939
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile: (818) 827-9099
Email:     cweber@bg.law
           rcoy@bg.law

Attorneys for Plaintiffs Randy Firestone,
Dmitry Radbel, Charles Evans IV, *et al.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDALL FIRESTONE; DMITRY RADBEL; CHARLES EVANS IV; RAMA NADELLA AND NAGAMANI NADELLA AS TRUSTEES OF THE NADELLA FAMILY TRUST; KANA VENTURES, LLC; SREE SAI SATISH ADUSUMILLI; SAROJA VALLURU; MITESH PATEL; REENA NAVULURI; CVR PROPERTIES, LLC; SUBBARAO INAMPUDI; KOTESWARI INAMPUDI; RAKESH NAVULURI; RAMAKRISHNA REDDY THUMATI; DAVID WHITTEN; RAYASAM V. PRASAD AND ANJANI R. PRASAD AS TRUSTEES OF THE PRASAD LIVING TRUST; SOMESWARA NAVULURI; GAUTAM NADELLA AND GANGA NADELLA AS TRUSTEES OF THE NADELLA 2014 REVOCABLE TRUST; AUSTIN MASKET; JACQUELINE (JACI) BOBO; GABRIELLE SAYSAMONE; BRIDGET BOTTORFF; ALAN BEUTLER; BRYNA MCNEELY; JAGAN VEMULAPALLI; JAY BEYNON; MARC MAYS; LINDA TOM; KARINA RODRIGUEZ JIMENEZ; SAMANTHA NADELLA AND DAVID COHEN AS TRUSTEES OF THE NADELLA COHEN FAMILY 2020 REVOCABLE TRUST; JOHN FREE; HATHAI BUNCHONGSILPA; SUNG RHEE; AND MARK SCHRAMM,<br><br>Plaintiffs, | Case No.<br><br>**COMPLAINT FOR:**<br><br>**(1) FRAUD—INTENTIONAL MISREPRESENTATION;**<br>**(2) FRAUD--CONCEALMENT**<br>**(3) NEGLIGENT MISREPRESENTATION;**<br>**(4) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>**(5) BREACH OF FIDUCIARY DUTY;**<br>**(6) RESCISSION;**<br>**(7) DECLARATORY RELIEF;**<br>**(8) PRELIMINARY RELIEF INCLUDING A TEMPORARY RESTRAINING ORDER AND APPOINTMENT OF A RECEIVER** |

2856403

v.

RESIDENTIAL PROPERTIES
RESOURCES FUND II, LLC;
RESIDENTIAL PROPERTIES
RESOURCES OPZ FUND I, LLC;
RPRFII CV I, LLC; HIGHGROVE
HOLDINGS MANAGEMENT, LLC;
AND DOES 1 THROUGH 10,

Defendants.

Plaintiffs Randall Firestone; Dmitry Radbel; Charles Evans IV; Rama Nadella and Nagamani Nadella as trustees of the Nadella Family Trust; Kana Ventures, LLC; Sree Sai Satish Adusumilli; Saroja Valluru; Mitesh Patel; Reena Navuluri; CVR Properties, LLC; Subbarao Inampudi; Koteswari Inampudi; Rakesh Navuluri; Ramakrishna Reddy Thumati; David Whitten; Rayasam V. Prasad and Anjani R. Prasad as trustees of The Prasad Living Trust; Someswara Navuluri; Gautam Nadella and Ganga Nadella as trustees of the Nadella 2014 Revocable Trust; Austin Masket; Jacqueline (Jaci) Bobo; Gabrielle Saysamone; Bridget Bottorff; Alan Beutler; Bryna McNeely; Jagan Vemulapalli; Jay Beynon; Marc Mays; Linda Tom; Karina Rodriguez Jimenez; Samantha Nadella and David Cohen as trustees of the Nadella Cohen Family 2020 Revocable Trust; John Free; Hathai Bunchongsilpa; Sung Rhee; and Mark Schramm (collectively, "Plaintiffs") (collectively, "Plaintiffs") allege that:

1.    This Complaint is filed because Defendant Highgrove Holdings Management, LLC, the manager of two investment funds formed to purchase, manage and lease residential properties, Defendants Residential Properties Resources Fund II, LLC and Residential Properties Resources OPZ Fund I, LLC, along with the two funds, have made material misrepresentations to Plaintiffs, have concealed material facts from Plaintiffs, are commingling assets of the Funds, are transferring properties out of the Funds to newly formed entities, and at least during fiscal year 2021, Plaintiffs are informed and believe, and based thereon allege, operated in a manner consistent with a Ponzi scheme, with investor funds being used to pay distributions to other investors.  Meanwhile, despite repeated written requests, the Funds and

2856403

Highgrove have represented that the Plaintiffs' investment funds are "safe" but have steadfastly refused to permit Plaintiffs (members and investors in the Funds) access to inspect and copy books and records as the Funds are required to do under applicable statutes and the Funds' operating agreements.  Instead, Highgrove Holdings Management, LLC and the two funds continue to delay any inspection to a later date and request information that has already been provided to them.  Meanwhile, assets are being commingled between the Funds and transferred out of the Funds.

2.    By this action, Plaintiffs seek declaratory relief, seek damages arising from the Defendants' actions and conduct alleged herein, and request preliminary relief of the appointment of a receiver for the Funds and related entity RPRFII CVI, LLC and for a temporary restraining order and preliminary injunction in aid of the receiver. Plaintiffs will separately file a motion requesting the appointment of a receiver, for a temporary restraining order and preliminary injunction and an application requesting that the motion be heard on an *ex parte* basis.

## **PARTIES**

3.    Plaintiff Randall Firestone is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

4.    Dmitry Radbel is an individual who, at all times relevant herein resided in the County of Los Angeles and the County of Riverside, State of California.

5.    Charles Evans IV is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

6.    Rama Nadella and Nagamani Nadella as trustees of the Nadella Family Trust are individuals who, at all times relevant herein resided in the County of Los Angeles, State of California.

7.    Kana Ventures, LLC is a California limited liability company with its principal place of business in Burlingame, California.

8.    Sree Sai Satish Adusumilli is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

2856403

9.      Saroja Valluru is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

10.     Mitesh Patel is an individual who, at all times relevant herein resided in Chicago, Illinois.

11.     Reena Navuluri is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

12.     CVR Properties, LLC, is an Alabama limited liability company that at all times relevant herein had its principal place of business in Alabama.

13.     Subbarao Inampudi is an individual who, at all times relevant herein resided in the County of Miami-Dade, State of Florida.

14.     Koteswari Inampudi is an individual who, at all times relevant herein resided in the County of Miami-Dade, State of Florida.

15.     Rakesh Navuluri is an individual who, at all times relevant herein resided in Chicago, Illinois.

16.     Ramakrishna Reddy Thumati is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

17.     David Whitten is an individual who, at all times relevant herein resided in Huntsville, Alabama.

18.     Rayasam V. Prasad and Anjani R. Prasad as trustees of The Prasad Living Trust are individuals who, at all times relevant herein resided in Jonesboro, Georgia.

19.     Someswara Navuluri is an individual who, at all times relevant herein resided in Bloomfield Hills, Michigan.

20.     Gautam Nadella and Ganga Nadella as trustees of the Nadella 2014 Revocable Trust are individuals who, at all times relevant herein resided in Menlo Park, California.

21.     Austin Masket is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

2856403

22.    Jacqueline (Jaci) Bobo is an individual who, at all times relevant herein resided in the County of Racine, State of Wisconsin.

23.    Gabrielle Saysamone is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

24.    Bridget Bottorff is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

25.    Alan Beutler is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

26.    Bryna McNeely is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

27.    Jagan Vemulapalli is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

28.    Jay Beynon is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

29.    Marc Mays is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

30.    Linda Tom is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

31.    Karina Rodriguez Jimenez is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

32.    Samantha Nadella and David Cohen as trustees of the Nadella Cohen Family 2020 Revocable Trust are individuals who, at all times relevant herein resided in the County of Los Angeles, State of California.

33.    John Free is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

34.    Hathai Bunchongsilpa is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

2856403

35.     Sung Rhee is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

36.     Mark Schramm is an individual who, at all times relevant herein resided in the County of Los Angeles, State of California.

37.     Defendant Residential Properties Resources Fund II, LLC is a Delaware limited liability company which, at all times relevant herein, transacted business in the County of Los Angeles, State of California and which has offices in Torrance, California and Milwaukee, Wisconsin.

38.     Defendant Residential Properties Resources OPZ Fund I, LLC is a Delaware limited liability company which, at all times relevant herein, transacted business in the County of Los Angeles, State of California and which has offices in Torrance, California and Milwaukee, Wisconsin.

39.     Defendant RPRFII CV I, LLC is a Delaware limited liability company which, at all times relevant herein, transacted business in the County of Los Angeles, State of California and which has offices in Torrance, California and Milwaukee, Wisconsin.

40.     Defendant Highgrove Holdings Management, LLC is a Delaware limited liability company which, at all times relevant herein, transacted business in the County of Los Angeles, State of California and which has offices in Torrance, California and Milwaukee, Wisconsin.

## JURISDICTION AND VENUE

41.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  Plaintiffs are individuals, trustees of trusts and limited liability companies, whose residences and principal places of businesses were, at all times relevant, in Los Angeles County, Riverside County, Burlingame, Carlsbad and Menlo Park, California; Las Vegas, Nevada; Jonesboro Georgia; Bloomfield Hills, Michigan; New York, New York; Coral Gables and Miami-Dade County, Florida; Huntsville,

2856403

Alabama; Mount Pleasant, Wisconsin, Chicago, Illinois; and Racine County, Wisconsin. Defendants are Delaware limited liability companies with offices in Milwaukee, Wisconsin and Torrance, California. The amount in controversy exceeds $75,000 exclusive of interest and costs.

42. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the conduct and acts alleged herein, including fraud (through intentional misrepresentations and concealment), and breaches of fiduciary duty and the implied covenant of good faith and fair dealing, occurred in, and resulted in damages, within this judicial district. In addition, Section 13.5(c) of the limited liability company agreements and Section 8(b)(ii) of the subscription agreements entered into between Plaintiffs and Defendants state that the United States District Court for the Central District of California or the Los Angeles County Superior Court are the courts with exclusive jurisdiction to determine disputes, claims or controversies to the extent that arbitration provisions do not apply.

## GENERAL ALLEGATIONS

43. Plaintiffs are members and investors in two limited liability companies that were formed to raise investor money to purchase and then manage and lease residential real properties, Residential Properties Resources Fund II, LLC ("RPRFII") and Residential Properties Resources OPZ Fund I, LLC ("OPZ") (RPRFII and OPZ are collectively referred to as the "Funds").

44. This Complaint is filed because of the urgent need for relief, including preliminary relief including the appointment of a receiver over the Funds and related entity RPRFII CVI, LLC ("CVI") and a temporary restraining order and preliminary injunction in aid of the receiver given that the Funds' manager, Highgrove Holdings Management, LLC ("Highgrove"), is commingling assets of the Funds, including the transfer of properties between the Funds. Highgrove is also transferring properties out of the Funds to newly formed entities as recently as October and November 2022, placing the properties at risk of further transfers and/or encumbrances. Plaintiffs are

2856403

informed and believe, and based thereon allege, that the Funds lack appropriate safeguards and controls in order to prevent Highgrove from commingling assets between the Funds and transferring properties out of the Funds.  In addition, Plaintiffs are informed and believe, and based thereon allege, that the Funds' unaudited financial statements for fiscal year 2021 evidence that the Funds operated in a manner consistent with a Ponzi scheme at least during 2021.  All of this is taking place while the Funds and Highgrove have refused to permit Plaintiffs (members and investors in the Funds) access to inspect and copy books and records as the Funds are required to do under applicable statutes and the Funds' operating agreements.  Instead, the Funds and Highgrove keep stating different reasons why any inspection of books and records needs to be delayed or keep asking for additional information prior to an inspection taking place when the information has already been provided.

45.  The Funds and Highgrove have repeatedly represented to Plaintiffs that their investments are "safe," that "the fund is safe," that "the fund is not in trouble," that "your investment is well capitalized and secure" and that "[w]e're not going to be losing anybody's dollars or anything like that.  Your investment is well capitalized and well secured."  However, the Funds have been unwilling to provide access to the Funds' financial records, other than a limited subset of documents hand-selected by the Funds.

46.  Plaintiffs are informed and believe, and based thereon allege, that as to the serious issue of the Funds operating in a manner consistent with a Ponzi scheme, the Funds' unaudited financial statements (compilations) for 2021 that were just recently sent to members and investors at the end of September 2022 evidence that the Funds' distributions to members were well beyond the operating profits or liquid assets of the Funds (other than new investments) and that the Funds' distributions to members/investors during at least 2021 must have come from new investments because there was no other source for the funds.  Further, although the Funds have frozen distributions to members/investors as of in or about April 2022, the Funds'

2856403

monthly snapshots sent to members/investors for October 2022 state that "[w]ith no commitment of the amount, cash distributions are anticipated to restart during the first quarter, to be received at the end of April 2023." True and correct copies of the October 2022 monthly snapshots are attached hereto as **Exhibits 1 and 2.**

47.  Although the investments in the Funds were in exchange for membership interests, the Funds were represented to members/investors as investment funds where monies invested would be invested by the Funds in residential properties in Milwaukee, Wisconsin obtained at below-market values and then the properties would be rehabbed and rented out, where the members/investors would receive quarterly distributions equating to a return on investment in excess of 16%. The members/investors in the Funds received quarterly statements that showed columns for the original investments/contribution, our account value as of that quarter, reinvestment account value (for distributions owed that were reinvested in the Funds rather than paid out) and our total portfolio value of investments. The quarterly statements also showed distributions, capital to be returned and return on investment ("ROI"). However, Plaintiffs are informed and believe, and based thereon allege, that the Funds stopped sending quarterly statements after in or about the third quarter of 2021.

48.  According to representations made by Highgrove during a RPRFII investor Zoom call on May 4, 2022, at that point RPRFII had $16.86 million in investor funds and OPZ had $9.143 in investor funds invested or membership interests at that point. Of that amount, Plaintiffs have collectively invested over $7.5 million for membership interests in the Funds as follows:

| Plaintiff Name | Name of Fund for the Membership Interest/Investment | Investment Amount(s) and Date(s) of Purchase of Membership Interest/Investment |
|---|---|---|
| Randall Firestone | RPRFII | $200,000 (2/21) |

2856403

|  |  | $100,000 (2/21) |
|---|---|---|
|  |  | $200,000 (8/19) |
| Dmitry Radbel | RPRFII | $80,000 (6/24/21) |
|  |  | $40,000 (9/24/19) |
|  |  | $40,000 (7/31/19) |
| Charles Evans | RPRFII | $100,000 (6/23/22) |
|  |  | $400,000 (7/8/20) |
|  |  | $100,000 (3/13/20) |
| Rama Nadella and Nagamani Nadella as trustees of the Nadella Family Trust | RPRFII | $1,100,000 (between 4/8/18 – 6/29/20) |
| Kana Ventures, LLC | RPRFII | $105,000 (7/21) |
|  |  | $75,000 (10/20) |
|  |  | $20,000 (5/20) |
| Sree Sai Satish Adusumilli and Saroja Valluru | OPZ | $20,000 (4/1/22) |
| Mitesh Patel and Reena Navuluri | RPRFII | $50,000 (1/22) |
| CVR Properties, LLC | RPRFII | $100,000 (1/7/22) |
| Subbarao Inampudi and Koteswari Inampudi | RPRFII | $100,000 (12/21) |
| Rakesh Navuluri | RPRFII | $100,000 (1/24/22) |
| Ramakrishna Reddy Thumati | RPRFII | $100,000 (12/31/21) |
| David Whitten | RPRFII | $100,000 (12/31/21) |

2856403

| Rayasam V. Prasad and Anjani R. Prasad as trustees of The Prasad Living Trust | RPRFII | $200,000 (12/29/21) |
|---|---|---|
| Someswara Navuluri | RPRFII | $100,000 (1/20/22) |
| Gautam Nadella and Ganga Nadella as trustees of the Nadella 2014 Revocable Trust | RPRFII | $500,000 (12/20) |
| Austin Masket | RPRFII | $120,000 (6/28/21) (RPRFII) |
| | OPZ | $250,000 (6/28/21) (OPZ) |
| Jacqueline (Jaci) Bobo | RPRFII | $40,000 (8/6/19) |
| Gabrielle Saysamone | RPRFII | $60,000 (11/20) $60,000 (11/18) |
| Bridget Bottorff | RPRFII | $20,000 (8/6/19) |
| Alan Beutler and Bryna McNeely | OPZ | $250,000 (6/14/21) |
| Jagan Vemulapalli | RPRFII | $100,000 (12/30/21) |
| Jay Beynon | RPRFII | $200,000 (12/15/20) $50,000 (3/27/20) $50,000 (12/21/18) |
| Marc Mays | OPZ | $200,000 (8/30/21) |
| Linda Tom | RPRFII | $100,000 (6/8/21) |
| | OPZ | $200,000 (8/30/21) $12,000 (3/3/21) |

2856403

| | | $50,000 (11/23/20) |
|---|---|---|
| Karina Rodriguez Jimenez | RPRFII | $80,000 (6/29/21) |
| Samantha Nadella and David Cohen as trustees of the Nadella Cohen Family 2020 Revocable Trust | RPRFII | $50,000 (1/10/21) |
| John Free | RPRFII | $25,000 (12/28/21) |
| | | $50,000 (12/17/21) |
| Hathai Bunchongsilpa | RPRFII | $20,000 (1/5/22) |
| | | $200,000 (1/26/21) |
| | | $200,000 (11/24/20) |
| | | $101,000 (11/30/19) |
| | | $50,000 (11/2/19) |
| | | $50,000 (11/14/18) |
| Sung Rhee | RPRFII | $150,000 (10/21/21) (RPRFII) |
| | OPZ | $100,000 (6/21/21) (OPZ) |
| Mark Schramm | OPZ | $250,000 (10/29/21) |
| | | $300,000 (12/22/20) |
| | RPRFII | $100,000 (9/16/19) |
| | | $30,000 (2/20/19) |
| | | $30,000 (12/28/18) |

49.    The Funds own numerous residential properties in Milwaukee, Wisconsin, but the properties have high vacancy rates.  According to the November 2022 monthly snapshot reports sent by Highgrove (the manager of the Funds) to Plaintiffs and other members/investors, RPRFII owns 207 properties with 347 total

2856403

units (the properties include duplexes and multi-unit residences) and OPZ owns 80 properties with 130 total units.  The vacancy rates of RPRII and OPZ properties are extremely high at 49.4% and 36%, respectively, as of November 2022 according to the monthly snapshots.  During an investor Zoom call on December 21, 2022, a slide again represents that RPRFII owns 207 properties with 347 units.  The slide also represents that RPRFII units have a 49.28% vacancy rate.  A true and correct copy of the slide is attached as **Exhibit 3**.  Highgrove's website as of December 2022 states that "Highgrove has been acquiring properties in the Milwaukee area at prices, in some cases, exceeding 50% off of fair market value.  Properties purchased according to our strategy provide tremendous a [sic] cash flow with 10% - 18% distributions annually.  Values are increasing year over year as Highgrove focuses on improving communities where purchases are made."

**Background of RPRFII**

50.  RPRFII was formed as a Delaware limited liability company on July 20, 2017.  On November 6, 2019, RPRFII filed its Application to Register a Foreign Limited Liability Company (LLC) with the California Secretary of State.  The business address listed for RPRFII was 2501 W. 237th Street, Suite E, Torrance, California 90505 (the "Torrance Location").  Section 1.4 of the RPPRII Amended and Restated Limited Liability Company Agreement states that RPRFII's principal place of business shall be at the Torrance Location.  A true and correct copy of the operating agreement is attached hereto as **Exhibit 4**.  RPRFII's Statement of Information filed with the California Secretary of State on November 22, 2021 also lists the Torrance Location as the business address.  However, RPRFII filed a LLC Termination— Certificate of Cancellation with the California Secretary of State on December 30, 2021.  Notwithstanding the cancellation, RPRFII still operates out of the Torrance Location in addition to its headquarters office in Milwaukee, Wisconsin.

51.  RPRFII's 2021 compilation states that RPRFII "was formed for the purpose of purchasing, developing and operating residential real estate in the United

States of America, with a focus in Milwaukee, Wisconsin. The Company is controlled by Highgrove Holdings Management, LLC ('Highgrove')." Highgrove and RPRFII represented that RPRFII is "a cash no debt investment fund with a line of credit for purchases and rehabilitation/construction. It has a projected 16.78% annual return of capital and a total projected return of 21.51% annualized over 3 years." As of the second quarter of 2020, RPRFII had 58 investor members.

52.    According to an executive summary circulated by RPRFII, "[i]nvestors buy into RPRF II with cash or Highgrove can accommodate funds from 401K accounts and self-directed IRAs. Highgrove also accepts 1031 exchanges. After the 3-year term, Investors may choose to take all their investment out of the fund; take part of it out (leaving a minimum of $20,000 in the program); or extend the term for their entire investment for an additional 3 years."

53.    In addition to the Plaintiffs and other investors purchasing membership interests in the Funds, the Funds also marketed an investor/member lending program where "[l]enders are investor Members of either RPRF II or the RPROZ Debt Fund," "[l]oans are secured by first trust deeds on either of the funds' properties, that are already owned and being rehabbed or are in escrow to be purchased" with an "[i]nterest rate [at] 12% percent annually, payable monthly at 1%" and "[i]nvestor Members can choose from a 6-month or one-year term of loan." Some of the Plaintiffs loaned amounts to the Funds as part of the investor/member lending program in addition to their investments in the Funds wherein they obtained membership interests.

### BACKGROUND OF OPZ

54.    OPZ was formed as a Delaware limited liability company on December 2, 2019. On December 12, 2019, OPZ filed its Application to Register a Foreign Limited Liability Company (LLC) with the California Secretary of State. OPZ's Statement of Information filed with the California Secretary of State on October 20, 2020 lists the Torrance Location as the business address. OPZ filed a LLC

Termination—Certificate of Cancellation with the California Secretary of State on December 30, 2021.  Notwithstanding the cancellation, OPZ still has an office at the Torrance Location in addition to its headquarters office in Milwaukee, Wisconsin.

55.  OPZ's 2021 compilation states that OPZ "was formed for the purpose of purchasing, developing and operating residential real estate in the United States of America.  The Company invests in real estate that qualifies as 'Opportunity Zone Property' (as defined by the Internal Revenue Services code).  The Company is controlled by Highgrove Holdings Management, LLC ('Highgrove')."  A true and correct copy of the OPZ compilation is attached hereto as **Exhibit 5**.  Highgrove and OPZ represented that OPZ offered "a similar return with the additional benefit of deferred capital gains—and potentially no capital gains on investment capital after 10 years, which greatly increases the after-tax Return of Investment.  These funds are focused on economically distressed communities that are designed to spur economic development."

56.  Highgrove's website states as of December 2022 that "[t]ax reform legislation known as the Tax Cuts and Jobs Act provides a significant opportunity for investors to defer capital gains owed.  The benefits are for those capital gains that are reinvested within 180 days of a capital gain event.  Highgrove offers two types of Opportunity Zone Funds.  One is a no-debt fund and the other is a fund with 50% debt, each with specific advantages to fit an investor's needs.  Qualified Opportunity Zones (QOZ's) allow investors to defer tax on capital gains by investing in Qualified Opportunity Funds (QOF's), which in turn make investments in QOZ real estate."

## BACKGROUND OF RPRFII CV I, LLC

57.  CVI is an entity that, according to the 2021 RPRFII compilation, is owned by the Funds, and which, although it is a separate limited liability company, operates through RPRFII.

58.  CVI was formed as a Delaware limited liability company on May 25, 2021.  RPRFII's 2021 compilation represents that RPRFII purchased a controlling share of

CVI in 2021 and now owns 99% of CVI:

> During the year ended December 31, 2021, the Company acquired a 99% ownership interest in RPRFII CV I, LLC ("CV I") for consideration totaling $740,000.  CV I is controlled by Highgrove; however, the Company is considered to have significant influence over the operations and financing decisions of CV I…

A true and correct copy of the compilation is attached hereto as **Exhibit 6**.

59.    RPRFII's compilation further represents that CVI's funds run through RPRFII.  As stated in the RPRFII's 2021 compilation:

> The Company maintains the cash transactions on behalf of CV I, an entity related to the Company through common control.  All of CV I's rental income and expenses are received/paid in/out of the Company's bank account with the corresponding recognition of a due to/from CV I…

60.    Plaintiffs are informed and believe, and based thereon allege, that CVI was formed by Highgrove in order to hold certain assets of the Funds and obtain a loan for the Funds using properties owned by the Funds as collateral.  Corevest American Finance Lender LLC filed a UCC-1 financing statement as to CVI's assets on July 19, 2021.  A true and correct copy of the financing statement is attached hereto as **Exhibit 7**.  The financing statement states that the collateral is "[a]ll assets and personal property of Debtor, whether now owned or hereafter acquired, and all products and proceeds thereof and additions and accessions thereto."

61.    Plaintiffs are informed and believe, and based thereon allege, that CVI's loan or line of credit is a loan that is commingled between the two Funds with commingled assets of both Funds securing the loan.

### Ownership and Management of the Funds

62.    The manager of the Funds is Highgrove.  According to the Funds' 2021 compilations, each of the Funds is "controlled" by Highgrove.  Highgrove filed its Certificate of Formation with the Delaware Secretary of State on May 9, 2013.  Highgrove filed its Amended and Restated Certificate of Formation on September 13, 2013.

2856403

63.     David Tomblin ("Tomblin") has alternately referred to himself as the Chief Executive Officer of and the Chair of the Investments Committee of Highgrove. Highgrove's management team also includes other members of the Tomblin family, including Ann Tomblin (David Tomblin's wife) as Vice President of Operations and Albert (Trey) Barton, III (David Tomblin's son-in-law) as Vice President of Technology and Research Development.  Plaintiffs are informed and believe, and based thereon allege, that Tomblin controls Highgrove and, indirectly through Highgrove, controls the Funds, and that all major decisions of Highgrove and the Funds are made by Tomblin.

**The Funds and Highgrove Have Not Complied with Applicable Statutes or with the Funds' Operating Agreements Regarding the Members' Ability to Inspect and Copy Financial Records of the Funds**

64.     The Funds are Delaware limited liability companies.  Delaware Limited Liability Company Act § 18-305 provides for the right of members to obtain access to inspect and copy books and records:

> (a) Each member of a limited liability company, in person or by attorney or other agent, has the right, subject to such reasonable standards (including standards governing what information (including books, records and other documents) is to be furnished at what time and location and at whose expense) as may be set forth in a limited liability company agreement or otherwise established by the manager or, if there is no manager, then by the members, to obtain from the limited liability company from time to time upon reasonable demand for any purpose reasonably related to the member's interest as a member of the limited liability company:
>
>> (1) True and full information regarding the status of the business and financial condition of the limited liability company;
>> (2) Promptly after becoming available, a copy of the limited liability company's federal, state and local income tax returns for each year;
>> (3) A current list of the name and last known business, residence or mailing address of each member and manager;
>> (4) A copy of any written limited liability company agreement and certificate of formation and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the

17

2856403

limited liability company agreement and any certificate and all
amendments thereto have been executed;

(5) True and full information regarding the amount of cash and a
description and statement of the agreed value of any other property or
services contributed by each member and which each member has agreed
to contribute in the future, and the date on which each became a member;
and

(6) Other information regarding the affairs of the limited liability
company as is just and reasonable.

The Funds were also registered with the California Secretary of State as foreign
limited liability companies during the time period that the Plaintiffs made and held
investments up until December 2021, when the Funds abruptly filed LLC
Terminations—Certificates of Cancellation with the California Secretary of State
without Plaintiffs' approval and while Plaintiffs were still members and investors in
the Funds.  Notwithstanding the alleged LLC termination, the Funds and Highgrove
still conduct business at the Torrance Location (they also have an office in
Milwaukee, Wisconsin that the Funds state is their headquarters office) and the
Plaintiffs are informed and believe, and based thereon allege, that the cancellations
filed in California related to the Funds seeking more favorable tax or other treatment
by designating Wisconsin as its headquarters.  The Funds have had repeated and
successive transactions of business in California and therefore transacted intrastate
business in California.  *See* California Corporations Code § 17708.03(a).  Even though
the Funds are Delaware limited liability companies, since Plaintiffs represent over
25% of the voting interests of the Funds, they are "entitled to all information and
inspection rights provided in Section 17704.10."  California Corporations Code §
17708.08; *see also* § 17713.04.  Thus, Plaintiffs' inspection rights are provided for
under Delaware law and are further set forth in the California Corporations Code,
including California Corporations Code § 17704.10(a) and (b) and 17701.13(d).

65.     In addition to Plaintiffs' rights under Delaware Limited Liability
Company Act § 18-305 and the California Corporations Code, Section 8.1(b) of the

18

Funds' operating agreements further provide for rights to inspect and copy the Funds' books and records on five business days' written notice:

> Pursuant to Section 18-305(g) of the Act, the Members shall only have such access to the books and records of the Company and the Series as expressly provided in this Agreement.  Subject to confidentiality and other restrictions established by the Manager (including those restrictions set forth in Section 18-305(c) of the Act), each Member (other than a Defaulting Member) and its duly authorized agents or representatives shall be afforded access to such books and records of each Series in which it is a Series Participant (and the books and records of the Company only to the extent they pertain to a Series in which such Member is a Series Participant) for inspection and copying (at the Series' expense) at any reasonable time during regular business hours of the Company upon five (5) Business Days' written notice to the Manager, if (i) the Member seeks the information for any purpose reasonably related to such Member's Interest, and (ii) the Member describes with particularity in such notice the information sought and the purpose for seeking the information. For the avoidance of doubt, a Member shall have no right to inspect or copy any books or records of, or pertaining to, a Series in which such Member is not a Series Participant.

True and correct copies of the Funds' operating agreements are attached hereto as **Exhibits 4** and **8**.

66.    As set forth hereinbelow, Plaintiffs have sent several written requests to Highgrove and the Funds to inspect and copy books and records and have set forth the documents requested to be reviewed and the purposes of the inspection, but, as set forth below, Highgrove and the Funds have not permitted Plaintiffs to do so in violation of the applicable statutes and the Funds' operating agreements.

67.    On July 18, 2022, one of the Plaintiffs, Randall Firestone ("Firestone"), sent an e-mail to Highgrove making a request to inspect and copy the Funds' books and records.  Highgrove responded on July 19, 2022, stating that it would provide the 2019 compilation, that the 2021 compilation would be distributed in September 2022, and that it did not agree to provide any other documents.  Firestone responded that he already had the 2019 compilation, that it was several years old, and again requested to inspect and copy the Funds' books and records.  Highgrove responded that the 2021

2856403

compilation was in process and that they were "consumed" with the conversion of the accounting system and would provide year-to-date financial statements by October 31, 2022.  Highgrove further stated that "[a]fter those dates we will glad [sic] to work with you to have you come into the office and look through any of the other items you requested.  We can set a date in November to do this."  True and correct copies of the e-mail communications are attached hereto as **Exhibit 9**.  Highgrove did not set a date in November 2022 for Firestone to inspect and copy the books and records and did not permit access.

68.     Following the Funds not providing access to the books and records, on August 17, 2022 certain of the Plaintiffs sent a written request to the Funds requesting access to inspect and copy specified categories of documents that comprise the Funds' financial records.  A true and correct copy of the e-mail and attached letter are attached hereto as **Exhibit 10**.  The Funds only provided a limited set of hand-selected documents and did not provide access to inspect or copy the remaining requested documents.

69.     During a RPRFII investor Zoom call on August 2, 2022, Tomblin (the Chief Executive Officer and/or person in control of Highgrove) stated that the Funds were delaying any inspection, claiming among other things that inspections of books and records would "jeopardize the well-being" of the Funds:

> We have two requests.  Anybody who would like to come into the office after the first week of November and inspect any books and records you're welcome to come in.  That will not though happen until the first of November.  We cannot jeopardize the well-being of the Fund for all the investors to have staff time right now to provide access.  Right now we're paying overtime.  Its affecting some of the health of Connie.  And you can come in all you want the first week of November and see whatever you want to your heart's content but until then we're not going to do it.

70.  After months of delay, the Funds did not provide access to inspect and copy the books and records during November 2022.  Instead, on November 21, 2022,

Plaintiffs sent a further written request for access to inspect and copy specified categories of documents that comprise the Funds' financial records.  As stated in the request:

> The purpose of the requested inspection and copying of books and records is to, among other things: (1) assess the status of the business and financial condition of the Funds, including but not limited to the assets, liabilities, income and expenses; (2) obtain transparency as to the transactions, purchases, sales and transfers entered into by the Funds; (3) assess the status and safety of the Clients' interests and investments in the Funds; (4) determine the accuracy of representations made by officers, directors, managers, members, agents, employees and authorized representatives of the Funds to the Clients; and (5) determine whether any further actions are appropriate.

True and correct copies of the e-mail and attached letter along with proofs of delivery of the letter via overnight delivery and certified mail are attached hereto as **Exhibit 11**.

71.     The Funds sent a response to the letter on November 23, 2022 via e-mail. True and correct copies of the e-mail and attached response letter are attached hereto as **Exhibit 12**.  The response letter did not agree to provide access to inspect and copy the books and records and instead stated that new letters had to be sent containing information already provided in the Plaintiffs' letter of November 21, 2022.

72.     Plaintiffs sent a response to the letter on November 28, 2022 (the next business day following the Thanksgiving holiday).  True and correct copies of the e-mail and attached letter along with proofs of delivery of the letter via overnight delivery and certified mail are attached hereto as **Exhibit 13**.

73.     The Funds sent a response the same day, on November 28, 2022, which again failed to provide access to inspect and copy the books and records and instead requested the same information referenced in the Funds' November 28, 2022 letter, which information was previously provided in the letter of November 21, 2022.  True

2856403

and correct copies of the e-mail and attached response letter are attached hereto as **Exhibit 14**.

74.    The Plaintiffs sent a response on November 29, 2022 noting that all of the information requested by the Funds was contained in the Plaintiffs' prior letter. True and correct copies of the e-mail and attached letter along with proofs of delivery of the letter via overnight delivery and certified mail are attached hereto as **Exhibit 15**.

75.    On December 2, 2022, the Funds and Highgrove responded that "I wanted to acknowledge you [sic] last set of letters and will respond on Monday when back at the office where the letters are at."  True and correct copies of the e-mail and attached response letter are attached hereto as **Exhibit 16**.  Plaintiffs did not receive any further response and the Funds and Highgrove have failed to provide access to inspect and copy the books and records.

76.    As to one of the limited hand-selected documents that have been provided by the Funds and Highgrove to Plaintiffs, RPRFII's 2019 compilation is several years old and states that it cannot be relied upon:

> We have performed a compilation engagement in accordance with Statements on Standards for Accounting and Review Services promulgated by the Accounting and Review Services Committee of the AICPA.  We did not audit or review the financial statements nor were we required to perform any procedures to verify the accuracy or completeness of the information provided by management.  Accordingly, we do not express an opinion, a conclusion, nor provide any assurance on these financial statements.  Management has elected to omit substantially all of the disclosures required by accounting principles generally accepted in the United States of America.  If the omitted disclosures were included in the financial statements they might influence the user's conclusions about the Company's financial position, results of operations, and cash flows.  Accordingly, the financial statements are not designed for those who are not informed about such matters.

A true and correct copy of the RPRFII 2019 compilation is attached hereto as **Exhibit 17**.

77.  The Funds' 2021 compilations that were just recently provided in or about the end of September 2022 contain disclosures that they are only compilations and that "[w]e did not audit or review the financial statements, nor were we required to perform any procedures to verify the accuracy or the completeness of the information provided by management.  We do not express an opinion, a conclusion, nor provide any form of assurance on these financial statements."  True and correct copies of the Funds' 2021 compilations are attached hereto as **Exhibit 5** and **6**.

78.  RPRFII and OPZ's financial statements for 2021 and 2019 are compilations (The Funds did not provide a compilation for 2020 and only later provided certain internal unaudited financial statements for 2020).  Unlike audited financial statements, compilations do not provide any assurance as to the accuracy and completeness of a company's financial statements.  For compilations, all information contained is based on management representations and the accountants do not take any steps to verify the information provided by management.

79.  The 2019 and 2021 compilations provided by the Funds to Plaintiffs therefore do not provide any assurance as to the financial status of the Funds, transparency as to transactions, purchases, sales and transfers, the status and safety of Plaintiffs' investments in the Funds, or the accuracy of representations made by Highgrove and the Funds to Plaintiffs.  The compilations are solely based on representations made by Highgrove and the Funds to the accountants that prepared the compilations with limited and incomplete information.

80.  The Funds, and Highgrove as manager of the Funds, have failed to comply with applicable Delaware and California statutes and with the Funds' operating agreements regarding the right of members/investors to inspect and copy the Funds' books and records and instead have repeatedly sought to delay any inspection rights.

**The Funds Keep Representing That the Plaintiffs' Investments Are "Safe" While Refusing to Provide Access to Financial Books and Records**

81.  The Funds have repeatedly made representations to Plaintiffs and other

members/investors in the Funds that their investments are "safe."  During a RPRFII investor Zoom call on May 4, 2022, the first slide stated that "[t]he fund is safe & we will be addressing challenges."  During that call, Tomblin stated that "first of all the fund is safe" and "the fund is not in trouble."  Then during a RPRFII investor Zoom call on June 28, 2022, one of the slides presented stated "[y]our investment is well capitalized and secure."  During that investor Zoom call Tomblin stated that "I want to reassure everyone that your investment is well capitalized and secure.  Well capitalized and secure.  And so we're not going to be losing property.  We're not going to be losing anybody's dollars or anything like that.  Your investment is well capitalized and well secured."

82.  While representing that the Plaintiffs and other members' investments are safe, beginning in July 2022, Highgrove and the Funds stated that they would not provide the members with access to inspect the Funds' financial books and records until November 2022.  However, despite repeated requests, access was not provided.  The Funds have repeatedly delayed access to the books and records, as of the filing of this Complaint, Defendants have continued to decline requests to provide access to the Funds' books and records.

83.  In addition to not complying with requests to inspect and copy books and records, Plaintiffs are informed and believe, and based thereon allege, that the Funds have also not sent quarterly statements to members/investors since after the third quarter of 2021.  Plaintiffs have not received quarterly account statements for the fourth quarter of 2021 or the first, second or third quarter of 2022.

**During October and November 2022, While Denying Access to Plaintiffs to Inspect and Copy Books and Records, Highgrove or Its Principals Formed Two New LLCs and Then Transferred 17 Properties Out of the Funds to the New Entities**

84.  On October 3, 2022, Wisconsin corporate records reflect that Highgrove or its principals formed two new entities, RPRFII F, LLC and RPROPZFI F, LLC, as

limited liability companies.  True and correct copies of the articles of organization for RPRFII F, LLC and RPROPZFI F, LLC are attached hereto as **Exhibits 18** and **19**.

85.  As shown in the chart below, just four days after forming the two new entities, the Funds transferred thirteen properties to the new entities.  True and correct copies of the quitclaim deeds and warranty deeds are attached hereto as **Exhibits 20** and **21**.  These transfers were not disclosed to Plaintiffs and Plaintiffs instead learned of the transfers from a search of public records.  To the contrary, the Funds concealed the transfers of the properties in the Funds' October and November 2022 monthly snapshots, which list the exact same number of properties and units held in October and November 2022 as the Funds held in September 2022.  Based on the transfer of properties, the monthly snapshots were false, misleading and concealed material information.

86.  The Funds then also transferred an additional four properties to the new entities during November 2022.  True and correct copies of the quitclaim deeds and warranty deeds are attached hereto as **Exhibit 22**.  These transfers were not disclosed to Plaintiffs and Plaintiffs instead learned of the transfers from a search of public records.  To the contrary, the Funds concealed the transfers of the properties in the October and November 2022 monthly snapshots, which list the exact same number of properties and units held in those months as the Funds held in September 2022.  Based on the transfer of properties, the monthly snapshots were false, misleading, and concealed material information.

87.  Although the sale and transfer documents list sale prices, there is no evidence that the new entities formed by Highgrove or its principals have assets other than the transferred properties they received from the Funds or that the new entities paid any amounts to the Funds in exchange for the transferred properties.  To the extent that the new entities paid any amounts to the Funds in exchange for the properties, there is no evidence that the amounts represent fair market value.  Although Highgrove and the Funds have declined to provide access to Plaintiffs to

inspect and copy the Funds' books and records and concealed the transfer of properties, it appears that the properties were sold and transferred for far less than fair market value or potentially for no value to the newly formed entities.  The transfers of properties during October and November 2022 are as follows:

| Property Transferred By/To | Address of Transferred Property | Date of Transfer |
|---|---|---|
| RPRFII / RPRFII F, LLC | 3166 N. Palmer St., Milwaukee, Wisconsin | 10/19/22 |
| RPRFII / RPRFII F, LLC | 2225 N. 40th St., Milwaukee, Wisconsin | 10/19/22 |
| CVI / RPRFII F, LLC | 3019 W. Oriole Dr., Milwaukee, Wisconsin | 10/19/22 |
| CVI / RPRFII F, LLC | 5027 N. 58th St., Milwaukee, Wisconsin | 10/19/22 |
| CVI / RPRFII F, LLC | 5131 N. 60th St., Milwaukee, Wisconsin | 10/19/22 |
| CVI / RPRFII F, LLC | 4555 N. 37th St., Milwaukee, Wisconsin | 10/19/22 |
| OPZ / RPROPZFI F, LLC | 3272-3274 N. Buffum St., Milwaukee, Wisconsin | 10/19/22 |
| OPZ  / OPZ RPROPZFI F, LLC | 1140 N. 26th St., Milwaukee, Wisconsin | 10/19/22 |
| CVI / RPROPZFI F, LLC | 3240 N. 29th St., Milwaukee, Wisconsin | 10/19/22 |
| CVI / RPROPZFI F, LLC | 4978 N. 37th St., Milwaukee, Wisconsin | 10/19/22 |
| CVI / RPROPZFI F, LLC | 3703 N. 24th St., Milwaukee, Wisconsin | 10/19/22 |
| CVI / RPROPZFI F, LLC | 3877 N. 26th St., Milwaukee, Wisconsin | 10/19/22 |
| CVI / RPROPZFI F, LLC | 4221 N. 42nd Pl., Milwaukee, Wisconsin | 10/19/22 |
| RPRFII / RPRFII F, LLC | 2770 N. 18th St., Milwaukee, Wisconsin | 11/28/22 |
| RPRFII / RPRFII F, LLC | 2611 N. 19th St., Milwaukee, Wisconsin | 11/28/22 |
| RPRFII / RPRFII F, LLC | 1631-1663 N. 36th St., Milwaukee, Wisconsin | 11/28/22 |
| RPRFII / RPRFII F, LLC | 3062-3064 N. 24th Pl., | 11/28/22 |

| | Milwaukee, Wisconsin | |
|---|---|---|

88.  Notwithstanding the Funds' transfer of properties to the newly formed limited liability companies during October and November 2022, the Funds' monthly snapshots (summaries) for both October and November 2022 falsely state that the Funds had the exact same number of properties in October and November 2022 as they did in September 2022.  True and correct copies of the RPRFII October and November monthly snapshots are attached hereto as **Exhibits 1** and **23**.  True and correct copies of the OPZ October and November monthly snapshots are attached hereto as **Exhibits 2** and **24**.

89.  The Funds' October and November 2022 monthly snapshots are a material misrepresentation or fraud through concealment by Highgrove and the Funds and obfuscate and conceal the Funds' transfer of properties out of the Funds during October and November 2022.  Highgrove's formation of new entities, then transferring Highgrove properties to the new entities days later while refusing disclosure to the Funds' members regarding the property transfers raises significant issues of concern in regard to further dissipation of the Funds' assets and transfers or encumbrances of the properties.

90.     In addition, the newly formed entities' formation documents, which documents were not provided by Highgrove or the Funds, and instead were located through a search of public records, do not show that the Funds have any direct ownership interest in the new entities.  In addition, public records do not show that the Funds have any security interest against the properties that were transferred.  The lack of direct ownership interests or security interests in the transferred properties creates significant risk to the Funds related to the properties.  To the extent that the properties were transferred to the new entities to serve as collateral for financing for the Funds, given that Highgrove has stated it is attempting to obtain financing using properties as collateral, transferring properties to newly formed entities and with no protections as

results in the same significant risk and misuse of assets to the Funds.  Further, the
Funds and Highgrove's misrepresentation that the Funds still own the properties in the
monthly snapshots and concealment regarding the transfers show an attempt to
actively conceal this information about the transfers from Plaintiffs and other
members/investors in the Funds.  While the properties are assets of the Funds (or were
assets of the Funds prior to the transfers), the properties are being transferred and
concealed by Highgrove and the Funds.

**Assets Are Improperly Being Commingled Between the Funds (Which Funds Have Different Members and Investors) and Properties Are Being Improperly Transferred Between the Funds for Inadequate Consideration**

91.  Section 1.6(d) of the Funds' operating agreement states in pertinent part
that "[t]he Manager and the Company shall not commingle the assets of one Series
with the assets of any other Series or the assets (if any) of the Company, generally."
Section 2.8 of the operating agreements also expressly prevents commingling of funds
with each other or the funds of Highgrove or any affiliates, and prohibits actions
prohibited by law and actions for which member consent is required.  True and correct
copies of the Funds' operating agreements are attached hereto as **Exhibit 4** and **8**.

92.  On July 13, 2020, Highgrove, on behalf of RPRFII, signed an amendment
to Section 2.4 of the RPRFII operating agreement for RPRFII (the amendment was
not separately approved by RPRFII's members), which amendment purports to permit
Highgrove to have limited rights to commingle assets by purchasing assets held by
related entities while title remains in the names of related entities but with RPRFII
having "full equitable interests."  The amendment states that:

> …the Company shall be authorized to purchase and/or invest in property
> investments in entities that are wholly owned, partially owned or
> controlled by members of Manager's management team ("Affiliated
> Entities"), and from time to time, the title to such properties may be held
> in the name of such Affiliated Entities on behalf of the Company, with
> the understanding that the Company shall have full equitable interests in

such properties.

A true and correct copy of the amendment is attached hereto as **Exhibit 4**.  Highgrove and the Funds did not seek approval of this amendment from the Funds' members and the amendment is contrary to Highgrove and the Funds' fiduciary duties.

93.  As set forth hereinbelow, RPRFII and OPZ (which have different members and investors) have commingled and transferred assets, RPRFII paid for certain of OPZ's costs and sold and transferred properties to OPZ for consideration that was only the original cost of the properties rather than the fair market value.  Plaintiffs are informed and believe, and based thereon allege, that some if not most of those properties had been rehabbed and were being rented out, and thus were worth substantially more than their initial purchase price, and yet were sold and transferred to OPZ for the initial purchase price.  This was a breach of the fiduciary duty owed to the RPRFII members/investors.  In addition, as to at least some of the transfers, OPZ did not actually pay RPRFII amounts in exchange for the sale and transfer of properties and instead only received unsecured promissory notes which may be valueless.  RPRFII's 2021 compilation represents that as to properties sold and transferred by RPRFII to OPZ during 2021:

> The properties were sold for consideration totaling their net book value of $1,590,371, the Company did not charge a mark-up on the cost of the properties.  In addition, the Company pays for certain costs on behalf of OPZ which resulted in an amount due from OPZ totaling $177,479 at December 31, 2021…

A true and correct copy of the RPRFII 2021 compilation is attached hereto as **Exhibit 6**.

94.  In addition, RFPRII's compilation represents that additional sales and transfers were made at cost rather than fair market value took place at the beginning of 2022:

On January 1, 2022, the Company sold certain properties to OPZ for

2856403

consideration totaling their net book value of $582,798. The Company did not charge a mark-up on the cost of the properties. The Company financed the acquisition through a loan to OPZ that is unsecured, due on demand and bears interest at 12% per annum.

A true and correct copy of the RPRFII 2021 compilation is attached hereto as **Exhibit 6**.

95.  In addition to the issues with the Funds commingling and transferring assets for less than fair market value or for no value, the Funds and CVI (the related entity that is also controlled by Highgrove) are also not dealing with each other in arms-length agreements. Aside from transfers of properties, large unsecured loans are also being made. Even though RPRFII has represented that it owns 99% of CVI, OPZ's compilation states that OPZ made an unsecured loan to CVI for over $1.1 million during 2021:

> During the year ended December 31, 2021, the Company provided loan financing to RPRFII CVI, LLC ("CVI") totaling $1,176,055. CVI is related to the Company through common control. The loan is unsecured, bears interest at 12% per annum and is due on demand. At December 31, 2021, the balance receivable from CVI totaled $1,176,055.

A true and correct copy of the OPZ 2021 compilation is attached hereto as **Exhibit 5**.

96.  Tomblin stated during a RPRFII Zoom investor call on September 27, 2022 that there were going to have to be transfers from CVI to a new entity, stating that "because some of these are in the CVI, the special purpose entity that was set up to handle the Corevest [loan], there has to be a transfer from CVI into a secondary special purpose entity. The lenders want the portfolio of 95 properties in a separate brand new setup special purpose entity." Tomblin stated that there were 95 properties that would secure a blanket loan. Yet, that explanation does not account for why RPRFII would transfer properties for less than fair market value to CVI or why OPZ would loan funds to CVI. The Funds' creation of CVI and utilizing a large amount of debt against the properties was contrary to the representations previously made by

Highgrove and RPRFII to members/investors that RPRFII would be a no-debt fund and placed the properties at risk when RPRFII was supposed to have no debt. Highgrove and the Funds later notified members/investors that the Funds were going to obtain loans and take on debt with the purpose of enhancing returns through leverage when, Plaintiffs are informed and believe, and based thereon allege, that, in reality, the Funds were obtaining loans and taking on debt because the Funds needed the amounts in order to continue to operate and pay debts as they became due.

97.   RPRFII also transferred and sold a significant number of properties to OPZ between December 2020 and August 2022 through quit claim deeds and warranty deeds signed by Highgrove (by Tomblin as CEO/President of Highgrove), thereby improperly commingling assets between the two Funds, as shown in the chart below:

| Address/Parcel Id. | Date |
|---|---|
| 3232 N. 24th Pl., Milwaukee, Wisconsin | 12/31/20 |
| 2118 N. 18th St., Milwaukee, Wisconsin | 12/31/20 |
| 100 E. Concordia Ave., Milwaukee, Wisconsin | 12/31/20 |
| 3275 N. 29th St., Milwaukee, Wisconsin | 12/31/20 |
| 3117 N. 29th St., Milwaukee, Wisconsin | 12/31/20 |
| 2909 W. Clarke St., Milwaukee, Wisconsin | 12/31/20 |
| 2318 W. Finn Pl., Milwaukee, Wisconsin | 12/31/20 |
| 2202-2204 N. 17th St., Milwaukee, Wisconsin | 12/31/20 |
| 3058 N. 29th St., Milwaukee, Wisconsin | 12/31/20 |
| 3209 N. 29th St., Milwaukee, Wisconsin | 12/31/20 |
| 3266 N. 28th St., Milwaukee, Wisconsin | 12/31/20 |
| 3431 N. 24th Pl., Milwaukee, Wisconsin | 12/31/20 |
| 3217 N. 33rd St., Milwaukee, Wisconsin | 12/31/20 |
| 3261 N. 24th Pl., Milwaukee, Wisconsin | 12/31/20 |
| 2427-2429 W. Nash St., Milwaukee, Wisconsin | 12/31/20 |
| 2329-2331 W. Finn Pl., Milwaukee, Wisconsin | 12/31/20 |

| | |
|---|---|
| 2734-2736 N. 34th St., Milwaukee, Wisconsin | 12/31/20 |
| 2338 W. Keefe Ave., Milwaukee, Wisconsin | 12/31/20 |
| 5271-5273 N. 38th St., Milwaukee, Wisconsin | 12/30/21 |
| 3279 N. Buffum St., Milwaukee, Wisconsin | 12/30/21 |
| 3351 N. 20th St., Milwaukee, Wisconsin | 12/30/21 |
| 1025 N. 24th St., Milwaukee, Wisconsin | 12/30/21 |
| 1727 W. Wright St., Milwaukee, Wisconsin | 12/30/21 |
| 2437 N. 29th St., Milwaukee, Wisconsin | 12/30/21 |
| 2813-2815 N. 33rd St., Milwaukee, Wisconsin | 12/30/21 |
| 3258-3260 N. Buffum St., Milwaukee, Wisconsin | 12/30/21 |
| 3264 N. Buffum St., Milwaukee, Wisconsin | 12/30/21 |
| 3266-3268 N. Buffum St., Milwaukee, Wisconsin | 12/30/21 |
| 3537 N. 23rd St., Milwaukee, Wisconsin | 12/30/21 |
| 3523 N. 23rd St., Milwaukee, Wisconsin | 12/30/21 |
| 3127 N. 34th St., Milwaukee, Wisconsin | 12/30/21 |
| 3272-3274 N. Buffum St., Milwaukee, Wisconsin | 12/30/21 |
| 1021 N. 24th St., Milwaukee, Wisconsin | 12/30/21 |
| 1911 W. Chambers St., Milwaukee, Wisconsin | 8/19/22 |
| 2450 W. Keefe Ave., Milwaukee, Wisconsin | 8/19/22 |

True and correct copies of the quitclaim deeds and warranty deeds are attached hereto as **Exhibits 25** and **26**.  Plaintiffs are informed and believe, and based thereon allege, that the transfers and sales from RPRFII to OPZ effectuated the commingling of assets to bring OPZ into regulatory compliance with restrictions relating to OPZ's status as an opportunity zone fund and were to the detriment of RPRFII and for the benefit of OPZ.

98.    In addition to the above transfers, there are also ten properties that appear to have been transferred from RPRFII to OPZ in June 2022, with the OPZ June 2022 monthly snapshot that was sent to members/investors stating that "[t]en stabilized

properties, totaling sixteen (16) units, were transferred to the Opportunity Zone Fund from RPRFII.  These were always Opportunity Zone properties that had to be temporarily held by RPRFII."  True and correct copies of the June RPRFII and OPZ monthly snapshots are attached hereto as **Exhibits 27** and **28**.  The chart in the OPZ monthly snapshot then lists OPZ as having 66 properties and 106 units in May 2022 increasing to 76 properties and 122 units in June 2022.  There is no explanation provided as to why RPRFII would have to temporarily hold OPZ properties or why the properties "were always Opportunity Zone properties."

99.   During a RPFII investor Zoom call that happened just recently, on December 21, 2022, Tomblin disclosed based on an investor question that RPRFII had recently sold and transferred a 10-unit apartment building (a building that had been rehabbed using RPRFII funds) to an entity owned by Tomblin's family partnership entity based on what Tomblin stated was an outside evaluation and appraisal.  RPRFII and Highgrove have not provided documents regarding the appraisal, evaluation or sale and transfer to members/investors.  RPRFII and Highgrove also have not provided evidence that his family partnership paid any amounts to RPRFII in exchange for the sale and transfer.

100.   Highgrove's commingling of assets, transfers of properties between the Funds for less than fair market value or for no value and large unsecured loans are not permitted, effectuated fraudulent transfers of assets belonging to one of the Funds to the other for inadequate consideration, are improper and a breach of fiduciary duty.

**The Funds Operated in Manner Consistent With a Ponzi Scheme – Profits Were Insufficient to Pay Distributions To Investors and Distributions During At Least 2021 Were Funded Through New Investments**

101.   In addition to commingling and transferring assets between the Funds, Plaintiffs are informed and believe, and based thereon allege, that the Funds' unaudited financial statements for 2021 recently sent to members and investors in or about the end of September 2022 reflect that the Funds operated in a manner

indicative of a Ponzi scheme at least during 2021.  The Ninth Circuit has described a Ponzi scheme as:

> … an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists.

*In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, 531 (9th Cir. 1990) ("*Agretech*").  In *Agretech*, the Ninth Circuit further stated that "[d]istributing funds to earlier investors from the receipt of monies from later investors is the hallmark of Ponzi schemes."  *Agretech* at 536; *see also Donell v. Kowell*, 533 F.3d 762, 767 n.2 (9th Cir. 2008).

102.  Plaintiffs are informed and believe, and based thereon allege, that the Funds used new investor funds to pay distributions to existing members/investors during 2021 before the Funds froze distributions in or about April 2022 (based on the limited information received by Plaintiffs from Highgrove and the Funds, it is uncertain as to whether the Funds operated in a manner consistent with a Ponzi scheme during 2022 before distributions were frozen).  Plaintiffs are informed and believe, and based thereon allege, that the amounts paid to investors for distributions during 2021 could not have come from any source other than from new investments.  Between 2020 and 2021, vacancies in properties owned by the Funds increased to a point where the Funds' business was unprofitable and the Funds purchased too many properties, even while sustaining net losses, leaving the Funds cash-strapped.

103.  Plaintiffs are informed and believe, and based thereon allege, that based on the information contained in RPRFII's compiled financial statements, the distributions to investors totaling $3,571,871 during 2021 could not have been made from RPRFII without the influx of new investor money.  Also, based on the

information available, Plaintiffs are informed and believe, and based thereon allege, that distributions during 2022 totaling $684,938 likely were funded with new investor money.  As for OPZ, based on the information contained in its compiled financial statements, Plaintiffs are informed and believe, and based thereon allege, that the distributions totaling $625,005 to investors during 2021 could not have been made without the influx of new investor money.

104.   During a RPRFII investor Zoom call on May 4, 2022, Tomblin asked the rhetorical question "where did the equity cash go recently" with the corresponding slide stating "Where did the Equity Cash go?"  In response to his rhetorical question, Tomblin stated that $2,992,145 went to purchase a 34-property package for RPRFII, $76,100 went to purchase a property for OPZ and that the Funds paid down a line of credit by $1,250,000 in March 2022 and paid down the line of credit further by $2,700,000 in May 2022.  Tomblin did not state that any of the investor funds had been used to pay amounts to other investors.  Yet, as set forth below, during at least 2021, Plaintiffs are informed and believe, and based thereon allege, that the Funds operated in a manner indicative of a Ponzi scheme and the representations made by Tomblin on behalf of Highgrove and the Funds as to what the members investments were used for were false or misleading and concealed that investor funds had been improperly used to pay other investors.

**The Funds' Distributions to Members/Investors During 2021 Were Consistent with a Ponzi Scheme**

105.   RPRFII and OPZ did not provide compilations to members/investors for 2020, telling members/investors that it was due to the pandemic.   That was notwithstanding Section 8.2 in the Funds' operating agreements, which stated that "[w]ith respect to each Series, the Manager shall prepare and deliver a report to each Series Participant in such Series within ninety (90) days after the end of each Fiscal Year and within thirty (30) days after the end of each of the first three quarters of each Fiscal Year, containing the following: (i) a balance sheet setting forth the assets,

liabilities and Series Participants' equity of such Series as of the end of such Fiscal Year or quarter (unaudited); and (ii) an income statement setting forth the net profit or net loss of such Series for such Fiscal Year or quarter (unaudited).  All such statements shall be prepared in accordance with generally accepted accounting principles, consistently applied for the periods indicated.  The Manager, in its sole discretion, may cause the balance sheet or income statement of any Series as of the end of, or with respect to, any Fiscal Year to be audited, at the expense of the applicable Series."  True and correct copies of the operating agreements are attached hereto as **Exhibits 4** and **8**.

106.  RPRFII's compilation for 2021 shows a net loss of ($127,150).  Meanwhile, during 2021, RPRFII made distributions to members of $3,571,871.  Those distributions could not have come from net profits during 2021 since the compilation shows that RPRFII was not profitable and had a net loss for 2021.  The distributions also could not have come from cash and cash equivalents (other than new investments) given that the compilation shows that at the beginning of the year cash and cash equivalents were $438,392 and at the end of the year were $1,949,512.  The statement of cash flows reflects cash flows from investment activities of $1,590,371 from sales of investment properties (which amount was exceeded by $1,905,773 spent in purchases of new investment properties and a $740,00 investment in an affiliate), $461,500 in proceeds from notes payable and $6,718,186 in new investments in RPRFII.  Plaintiffs are informed and believe, and based thereon allege, that the distributions to members of $3,571,871 during 2021 had to have come from new investments because the compilation shows that the funds could not have come from anywhere else.  A true and correct copy of RPRFII's 2021 compilation is attached hereto as **Exhibit 6**.  Although Plaintiffs have requested access to inspect and copy the Funds' books and records that would provide further information as to the Funds' use of investments from members and investors during 2021 and other years, the Funds have delayed or declined providing access to inspect and copy the books and records.  As of the filing of this

Complaint, Highgrove and the Funds have continued to decline to provide access to inspect and copy the Funds' books and records.

107.   According to the 2021 compilation for RPRFII, RPRFII owns 99% of CVI. Plaintiffs are informed and believe, and based thereon allege, that if RPRFII received income from CVI, income would be reflected in RPRFII's income statement.   As discussed above, RPRFII had net losses for 2021 and year-to-date 2022 as of August 31, 2022.   RPRFII also had a net loss of ($100,800) in 2020.   A true and correct copy of RPRFII's internal unaudited income statement as of December 31, 2020 is attached hereto as **Exhibit 29**.

108.   OPZ's compilation for 2021 shows a net loss of ($85,178).   Meanwhile, during 2021, OPZ made distributions to members of $625,005.   Those distributions could not have come from net profits during 2021 since OPZ was not profitable and had a net loss for 2021.   The distributions also could not have come from OPZ's cash and cash equivalents (other than proceeds from new investments).   The compilation shows that at the beginning of the year cash and cash equivalents were $452,347 and at the end of the year were $1,959,912.   The statement of cash flows reflects that the only cash that came in during 2021 consisted of $145,000 in proceeds from notes payable (which amount was more than exceeded by $2,815,863 in cash used for purchases and development of investment properties, $353,896 paid in syndication costs to raise new investments and $33,138 paid on notes payable) and $5,846,481 in new investments in OPZ.   Plaintiffs are informed and believe, and based thereon allege, that OPZ's distributions to members of $625,005 during 2021 had to have come from new investments because the compilation shows that the funds could not have come from anywhere else.   A true and correct copy of OPZ's 2021 compilation is attached hereto as **Exhibit 5**.   Although Plaintiffs have requested access to inspect and copy the Funds' books and records that would provide further information as to the Funds' use of investments from members and investors during 2021 and other years, the Funds have delayed or declined providing access to inspect and copy the books and records.   As of

the filing of this Complaint, Highgrove and the Funds have continued to decline to provide access to inspect and copy the Funds' books and records.

109.   Plaintiffs are informed and believe, and based thereon allege, that new investments in 2021 were made after Highgrove and the Funds reassured members/investors as to the safety and return on investment of their investments. Plaintiffs are informed and believe, and based thereon allege, that the new investments made provided the means for the Funds to pay distributions back to themselves and to other members/investors.

110.   The Funds' net losses have continued in 2022.  Highgrove and RPRFII represented during the September 27, 2022 investor Zoom call that RPRFII and CVI had net losses for 2022, with RPRFII having a net loss year-to-date of ($136,221) and CVI having a net loss year-to-date of ($62,717) but that the net losses were "improving."  Notwithstanding the year-to-date net losses for 2022, the Funds have stated in recent monthly snapshots that the Funds' distributions to members/investors are set to restart in 2023.  In addition, during a RPRFII investor Zoom call on December 21, 2022, one of the slides also stated that "[w]ith no commitment of the amount, cash distributions are anticipated to restart during the first quarter, to be received at the end of April."  A true and correct copy of the slide is attached hereto as **Exhibit 30**.  During that RPRFII investor Zoom call on December 21, 2022, another slide states that the draft October 2022 financial statements show a year-to-date net loss of ($218,477) for RPRFII and a year-to-date net loss of ($54,881) for CVI.  The slide shows positive net income for the month of October in the amount of $25,075 for RPRFII and $10,161 for CVI even though an earlier slide showed that RPRFII has a vacancy rate of 49.28%. Another slide shows that the draft November 2022 financial statements show a year-to-date net loss of ($207,350) for RPRFII and a year-to-date net loss of ($86,744) for CVI. The slide shows positive net income for the month of November in the amount of $11,425 for RPRFII and $31,988 for CVI.  Tomblin stated that "we feel very comfortable and confident of reinstating the cash distributions in the first quarter…"

111.   Plaintiffs are informed and believe, and based thereon allege, that during 2021, both RPRFII and OPZ distributed funds to members/investors that came from new investments from other members/investors rather than from profits, thereby giving the impression of a legitimate profit-making business opportunity when in reality the Funds were unprofitable and cash-strapped, relying on new investments, and that the distributions during 2021 came from the funds of other investors.

**Percentage Commissions Were Incurred and Paid by the Funds to Obtain New Investments, Which Is Consistent with Many Ponzi Schemes**

112.   Members and investors were encouraged by the Funds and Highgrove during 2021 to bring in new investors and investments into the Funds.  During 2021, RPRFII paid $322,348 in "syndication costs" and OPZ paid $353,896 in "syndication costs" while the Funds were unprofitable and sustained net losses.  As stated in Note 2(g) of the Funds' 2021 compilations, "[s]yndication costs are those incurred by the Company to market or sell membership interests."  The Funds' members were promised a commission of 1% on any new investments they brought into the Funds and then received statements showing commissions to be paid based on bringing in new investors and investments.  The push by Highgrove and the Funds to bring in new investors and investments and to pay commissions to do so is consistent with many Ponzi schemes.

**The Funds and Highgrove Have Other Significant Issues Regarding Concentration of Authority, Lack of Internal Controls, Unreliable Accounting and Inappropriate Actions That Are Wholly Inconsistent with Acting as a Fiduciary to Plaintiffs**

113.   The Funds have not had audits performed and have only paid for compilations, which do not provide for any assurance as to the accuracy of the financial information presented.  In addition, Plaintiffs are informed and believe, and based thereon allege, that the Funds' internal accounting is not consistent or reliable and that Highgrove (through Tomblin) maintains tight control over access to financial

information.   Notwithstanding Highgrove's management structure including other officers, Plaintiffs are informed and believe, and based thereon allege, that Tomblin controls Highgrove and the Funds and makes all major decisions.   Plaintiffs are further informed and believe, and based thereon allege, that the Funds' serious and problematic issues go beyond commingling assets between the Funds, transferring assets out of the Funds and operating as in a manner consistent with a Ponzi scheme (at a minimum during 2021), including: (1) the Funds and Highgrove lack appropriate internal controls, providing the ability of Tomblin to control all material aspects of the Funds; (2) Highgrove has authorized purchases of properties with little-to-no due diligence or inspections because they "cost too much"; (3) Highgrove had a focus to bring in more money in investments before the end of 2021 rather than concentrating on operations or profitability; (4) the Funds paid labor costs and used the Funds' resources to rehab and perform work on properties owned directly or indirectly by Tomblin's son-in-law, Vice President of Operations and Research Development, Albert (Trey) Barton, III; (5) Highgrove and the Funds circulated financial status summaries for the Funds that showed profits when the Funds were actually losing money; and (6) OPZ was out of compliance with federal law as an opportunity zone fund and then commingled assets by having RPRFII transfer properties to OPZ in order to achieve compliance.

**Highgrove and the Funds Made Material Misrepresentations and Material Omissions to Plaintiffs**

114.   In regard to due diligence on properties to be purchased, the Highgrove Progress Report for Funds for the period January 31, 2019 through June 15, 2020 provided to members/investors states that "[a]n initial review of each property takes place, to determine whether it meets the criteria for moving on to escrow. The criteria include but are not limited to: a. Property value b. Anticipated rental returns, once stabilized c. An initial estimate of rehabilitation costs." A true and correct copy of the Highgrove Progress Report for Funds for the period January 31, 2019 through June 15, 2020 is attached hereto as **Exhibit 31** (the quoted language is at p. 5).   The progress

report further made assertions such as "[d]espite a reeling economy and the toughest tests for its leadership team, Highgrove is not just surviving—it is in fact thriving", "[f]rom the start, this business has had no leverage.  While it does have a small line of credit, Highgrove has no debt.  We deal in cash only property purchases.  The return on capital percentages we have distributed quarterly to our Investor Members has remained at 16.78% over the past 4 years."  The progress report further includes a projection for total stabilized gross monthly rental income of $161,480, total stabilized gross annual rental income of $1,936,560 and total stabilized projected annual net operating income based on stabilized rental income projections of $968,880.

115.   Notwithstanding the representations made in Highgrove's progress report, RPRFII's internal unaudited financial statements for 2020 reflect that RPRFII was not "thriving" and instead had operating expenses that exceeded its income and had a net loss.  RPRFII's internal unaudited financial statements reflect that RPRFII had income of $887,284, expenses of $988,084 and a net loss of ($100,800).  The internal unaudited financial statement also shows that for the month of December 2020, RPRFII had income of $103,225, expenses of $112,224 and a net loss for December 2020 of ($8,998).  While Highgrove reported in its progress report during 2020 that the projection for gross monthly rental income was $161,480, the reality was that it was far less and the net income on a monthly basis was negative.  Further, while Highgrove reported in its progress report that the projection for total stabilized annual net operating income was $968,800, in reality there was no net income and instead was a net loss of ($100,800).  The Funds did not provide compilations, reviews or audits to Plaintiffs and other members/investors, stating that the lack of financial statements was based on the pandemic.  Highgrove and the Funds did not provide internal unaudited financial statements until 2022 and only provided them, without any back-up documents, after demands of members/investors, and while Highgrove and the Funds continued to request other documents.

116.   During a RPRFII investor Zoom call on November 16, 2021, Highgrove reported that RPRFII had closed on 69 properties with 79 units, mostly single family residential properties, for $3.8 million, that there was only a 20% vacancy rate and with the properties in overall good condition, with less than average rehab necessary. Plaintiffs are informed and believe, and based thereon allege, that subsequent disclosures by RPRFII and Highgrove show that the units had much higher than a 20% vacancy rate and that the properties required extensive rehab.  Tomblin later stated that Highgrove or the Funds were suing the seller for misrepresentations, but RPRFII and Highgrove failed to conduct the appropriate due diligence for the purchase and then made false or misleading statements to Plaintiffs and other members/investors.

117.   Plaintiffs are informed and believe, and based thereon allege, that in order to obtain investments for membership interests from Plaintiffs and in order to prevent or delay Plaintiffs and other members/investors from taking actions against Highgrove and the Funds, Highgrove and the Funds made misrepresentations and omissions including but not limited to the following:

a.   That Plaintiffs' investments are "safe," that "the fund is safe," that "the fund is not in trouble," that "your investment is well capitalized and secure" and that "[w]e're not going to be losing anybody's dollars or anything like that.  Your investment is well capitalized and well secured" while, in reality, the assets of the Funds were being commingled, assets of the Funds were transferred between each other, to CVI and to new entities, and investor funds were also being paid to other investors in a manner indicative of a Ponzi scheme;

b.   That investor funds were solely used to buy properties and pay down a line of credit without mention of the investor funds being used to pay other investors;

c.  That the refusal to provide access to Plaintiffs to inspect and copy the Funds' books and records was because of implementation of a new accounting system or vacation or holiday schedules or that access would jeopardize the well-being of the Fund;

d.  That the information in the monthly snapshots provided by Highgrove was accurate;

e.  That properties were to be purchased and rehabbed with all cash and no debt;

f.  That there was no concern regarding losing the properties even if the properties were vacant given that the properties and rehab of the properties was to be done with all cash and no debt;

g.  That properties would be rehabbed quickly and cheaply;

h.  That vacancy rates were low;

i.  That the Funds and Highgrove were well-managed with a long and successful track record and officers and personnel who were well-qualified for their positions; and

j.  That there was a high degree of confidence of an internal rate of return of 20% or higher, allowing the Funds to make substantial quarterly dividends or payments while the properties continued to appreciate in value.

**The Urgent Need for Appointment of a Receiver and for a Temporary Restraining Order and Preliminary Injunction in Aid of the Receiver**

118.   If a receiver is not appointed, Highgrove will continue managing the Funds and the Funds' assets will be at risk of being further commingled, dissipated, and subject to further transfers or encumbrances that are not in the Funds' best interests.  In addition, given that the Funds have provided notice in recent monthly snapshots that distributions to members/investors will restart in 2023, if a receiver is not promptly appointed, the Funds may also continue to operate in a manner consistent with a Ponzi scheme during

2856403

2023 and beyond.  Any legal remedy other than the requested relief of appointment of a receiver in order to marshal and protect the Funds' assets and a temporary restraining order and preliminary injunction to aid the receiver would be inadequate because it would place the assets of the Funds at significant risk for further misuse and dissipation.

119.   Section 13.2(c) in the Funds' operating agreements purport to waive and do away with the right to seek appointment of a receiver, providing that members "specifically renounce, waive and forfeit all rights whether arising under contract or statute or by operation of law, to . . . seek or maintain any action for the appointment of a receiver for the Company, any Series or any asset of any Series."  The operating agreements go even beyond that by purporting in Section 11.2 to do away with and waive the right to remove the manager (Highgrove), stating that "[t]he Manager may not be removed by the Members or otherwise as the Manager of the Company or any Series."  The operating agreements also purport in Section 1.11 of the operating agreements to eliminate any fiduciary duty by Highgrove to the Funds to the extent permitted by Section 18-1101 including fiduciary duties, implied duties, duties of loyalty, care, and good faith and fair dealing.  The Funds' operating agreement provisions that purport to eliminate any ability of Plaintiffs and other members/investors to prevent the improper commingling of assets, fraudulent transfer of assets, operating in a manner consistent with a Ponzi scheme and to prevent Highgrove, as manager of the Funds, from acting without any semblance of fiduciary duties, are unconscionable, unenforceable and void as against public policy.

120.   In addition to the Court's authority based on applicable statutes, the Court's Local Rules and case law, Section 13.5(b) of the Funds' operating agreements also provide the Court with authority to "limit any term or provision as to make it enforceable or valid within the requirements of applicable law, and, in the event such term or provision cannot be so limited, this Agreement or such Series Agreement shall be construed to omit such invalid or unenforceable provisions."  Fed. R. Civ. P. 66 and Central District of California Local Rule ("LR") 66-1 exist so that the Court has the

power to appoint a receiver for good cause shown.  LR 66-1 states that "[u]pon good cause shown by verified pleadings or declaration, the Court may in its discretion appoint a temporary receiver without notice to creditors."  Case law has held that "[u]nder Rule 66 of the Federal Rules of Civil Procedure, federal courts are authorized to appoint receivers to take and preserve property at issue in the underlying action."  *See, e.g., McCool v. Wilson*, 2020 WL 5044193, at \*3 (C.D. Cal. 2020).  The Funds' operating agreement provisions cannot limit the Court's authority to appoint a receiver over the Funds for good cause shown.  Plaintiffs will separately file a motion for the appointment of a receiver and for a temporary restraining order and preliminary injunction in aid of the receiver, which motion will be supported by declarations.

121.   The Funds' operating agreement provisions purporting to waive the ability of this Court to appoint a receiver for good cause shown are unconscionable, attempt to perpetrate an ongoing fraud on Plaintiffs, are void as against public policy and would permit continued commingling, transfers of assets of the Funds, operating in a manner consistent with a Ponzi scheme, and other improper acts.

**The Operating Agreement Provisions Purporting to Require Binding Arbitration of the Relief Sought of a Receiver and a Temporary Restraining Order and Preliminary Injunction Are Also Void**

122.   The Funds' operating agreements and subscription agreements also purport to require binding arbitration of issues related to the Funds, the operating agreements and the subscription agreements.  However, pursuant to Fed. R. Civ. P. 66 and LR 66-1, only the Court and not a private arbitrator has the authority to appoint a receiver and to enter a temporary restraining order and preliminary injunction for good cause shown.  Given the nature of the acts and omissions of Highgrove and the Funds, there is no effective alternate relief and the preliminary relief sought cannot be granted by an arbitrator.  The provisions are unconscionable, would result in the denial of basic rights and remedies, including the appointment of a receiver, and are void as against public policy.

2856403

## **FIRST CLAIM FOR RELIEF**

### **(Fraud—Intentional Misrepresentation**

### **Against Defendants Highgrove and the Funds)**

123.   Plaintiffs re-assert the allegations set forth in the general allegations above, as though set forth in full herein.

124.   Highgrove and the Funds made material misrepresentations to Plaintiffs in order to induce them to invest in the Funds and then to delay Plaintiffs from taking actions to protect their rights as to their investments in the Funds.  Among other things, Highgrove and the Funds made the following misrepresentations:

a.   That Plaintiffs' investments are "safe," that "the fund is safe," that "the fund is not in trouble," that "your investment is well capitalized and secure" and that "[w]e're not going to be losing anybody's dollars or anything like that.  Your investment is well capitalized and well secured" while, in reality, the assets of the Funds were being commingled, assets of the Funds were transferred between each other, to CVI and to new entities, and investor funds were also being paid to other investors in a manner indicative of a Ponzi scheme;

b.   That investor funds were solely used to buy properties and pay down a line of credit without mention of the investor funds being used to pay other investors;

c.   That the refusal to provide access to Plaintiffs to inspect and copy the Funds' books and records was because of implementation of a new accounting system or vacation or holiday schedules or that access would jeopardize the well-being of the Fund;

d.   That the information in the monthly snapshots provided by Highgrove was accurate;

46

e.  That properties were to be purchased and rehabbed with all cash and no debt;

f.  That there was no concern regarding losing the properties even if the properties were vacant given that the properties and rehab of the properties was to be done with all cash and no debt;

g.  That properties would be rehabbed quickly and cheaply;

h.  That vacancy rates were low;

i.  That the Funds and Highgrove were well-managed with a long and successful track record and officers and personnel who were well-qualified for their positions; and

j.  That there was a high degree of confidence of an internal rate of return of 20% or higher, allowing the Funds to make substantial quarterly dividends or payments while the properties continued to appreciate in value.

125.   At the time of the misrepresentations to Plaintiffs, Highgrove and the Funds had knowledge of the falsity of the misrepresentations.

126.   In making the misrepresentations, Highgrove and the Funds had intent to induce reliance and to deceive the Plaintiffs.

127.   Plaintiffs actually and justifiably relied on the misrepresentations of Highgrove and the Funds.

128.   As a result of the acts of Highgrove and the Funds, Plaintiffs have been damaged in an amount not less than $8 million, but in an amount to be proven at trial.

129.   Additionally, in engaging in the acts alleged herein, Defendants acted intentionally, willfully, wantonly and with reckless disregard of Plaintiffs' rights and with actual malice, oppression, and fraud.  As such, Defendants are subject to punitive damages based on their wrongful actions toward Plaintiffs.

**SECOND CLAIM FOR RELIEF**

**(Fraud—Concealment**

2856403

**Against Defendants Highgrove and the Funds)**

130.   Plaintiffs re-assert the allegations set forth in the general allegations above, as though set forth in full herein.

131.   Highgrove and the Funds concealed, suppressed, and omitted material facts to Plaintiffs.  Among other things, Highgrove and the Funds concealed material facts in order to induce Plaintiffs to invest in the Funds and then to delay Plaintiffs from taking actions to protect their rights as to their investments in the Funds, including, but not limited to:

    a.  That Plaintiffs' investments are "safe," that "the fund is safe," that "the fund is not in trouble," that "your investment is well capitalized and secure" and that "[w]e're not going to be losing anybody's dollars or anything like that.  Your investment is well capitalized and well secured" while, in reality, the assets of the Funds were being commingled, assets of the Funds were transferred between each other, to CVI and to new entities, and investor funds were also being paid to other investors in a manner indicative of a Ponzi scheme;

    b.  That investor funds were solely used to buy properties and pay down a line of credit without mention of the investor funds being used to pay other investors;

    c.  That the refusal to provide access to Plaintiffs to inspect and copy the Funds' books and records was because of implementation of a new accounting system or vacation or holiday schedules or that access would jeopardize the well-being of the Funds when the refusal was to delay or prevent access;

    d.  That the information in the monthly snapshots provided by Highgrove was accurate when the information was inaccurate, and,

among other things, did not reflect that properties had been transferred out of the Funds to newly formed entities;

    e. That properties were to be purchased and rehabbed with all cash and no debt when debt was used;

    f. That properties would be rehabbed quickly and cheaply when, in reality, the rehab projects had a backlog, were expensive and the Funds did not have sufficient liquid funds to rehab the properties;

    g. That vacancy rates were low when the vacancy rates kept on increasing dramatically and the Funds continued to purchase more properties notwithstanding high vacancy rates;

    h. That the Funds and Highgrove were well-managed with a long and successful track record and officers and personnel who were well-qualified for their positions when the management of Highgrove and the Funds lacked appropriate internal controls and commingled and improperly transferred assets; and

    i. That there was a high degree of confidence of an internal rate of return of 20% or higher, allowing the Funds to make substantial quarterly dividends or payments while the properties continued to appreciate in value.

132.   Highgrove and the Funds had a duty to disclose the material facts to Plaintiffs.

133.   Highgrove and the Funds intentionally concealed the material facts from Plaintiffs with the intent to defraud and deceive Plaintiffs.

134.   Plaintiffs were unaware of the material facts and would not have acted as they did if they had known about the concealed facts.

135.   As a result of the concealment of material facts and the acts of Highgrove and the Funds, Plaintiffs have been damaged in an amount not less than $8 million, but in an amount to be proven at trial.

136.   Additionally, in engaging in the acts alleged herein, Defendants acted intentionally, willfully, wantonly and with reckless disregard of Plaintiffs' rights and with actual malice, oppression, and fraud.  As such, Defendants are subject to punitive damages based on their wrongful actions toward Plaintiffs.

## THIRD CLAIM FOR RELIEF

### (Negligent Misrepresentation

### Against Defendants Highgrove and the Funds)

137.   Plaintiffs re-assert the allegations set forth in the general allegations above, as though set forth in full herein.

138.   Highgrove and the Funds made material misrepresentations and omitted material facts to Plaintiffs.  Among other things, Highgrove and the Funds made the following misrepresentations:

a.  That Plaintiffs' investments are "safe," that "the fund is safe," that "the fund is not in trouble," that "your investment is well capitalized and secure" and that "[w]e're not going to be losing anybody's dollars or anything like that.  Your investment is well capitalized and well secured" while, in reality, the assets of the Funds were being commingled, assets of the Funds were transferred between each other, to CVI and to new entities, and investor funds were also being paid to other investors in a manner indicative of a Ponzi scheme;

b.  That investor funds were solely used to buy properties and pay down a line of credit without mention of the investor funds being used to pay other investors;

c.  That the refusal to provide access to Plaintiffs to inspect and copy the Funds' books and records was because of implementation of a new accounting system or vacation or holiday schedules or that access would jeopardize the well-being of the Funds;

2856403

d.  That the information in the monthly snapshots provided by Highgrove was accurate;

e.  That properties were to be purchased and rehabbed with all cash and no debt;

f.  That there was no concern regarding losing the properties even if the properties were vacant given that the properties and rehab of the properties was to be done with all cash and no debt;

g.  That properties would be rehabbed quickly and cheaply;

h.  That vacancy rates were low;

i.  That the Funds and Highgrove were well-managed with a long and successful track record and officers and personnel who were well-qualified for their positions; and

j.  That there was a high degree of confidence of an internal rate of return of 20% or higher, allowing the Funds to make substantial quarterly dividends or payments while the properties continued to appreciate in value.

139.   At the time of the misrepresentations and concealment/omissions, Highgrove and the Funds had no reason to believe that the misrepresentations and omissions were true.

140.   In making the misrepresentations and omissions, Highgrove and the Funds had intent to induce reliance by the Plaintiffs.

141.   Plaintiffs actually and justifiably relied on the misrepresentations and omissions of Highgrove and the Funds.

142.   As a result of the acts of Highgrove and the Funds, Plaintiffs have been damaged in an amount not less than $8 million, but in an amount to be proven at trial.

## **FOURTH CLAIM FOR RELIEF**

### **(Breach of the Implied Covenant of Good Faith and Fair Dealing Against Defendants Highgrove and the Funds)**

2856403

143.   Plaintiffs re-assert the allegations set forth in the general allegations above, as though set forth in full herein.

144.   Plaintiffs entered into subscription agreements with Highgrove and the Funds in regard to Plaintiffs' investments in the Funds in order to obtain membership interests.  The Funds were to be managed and operated in a manner consistent applicable law and with the Funds' operating agreements.

145.   Plaintiffs have done all or substantially all of the things that they were required to do by making investments in the Funds in exchange for membership interests.

146.   The conditions required for Highgrove and the Funds' performance have occurred.

147.   Highgrove and the Funds have unfairly interfered with the Plaintiffs' rights to receive the benefit under the contracts by, among other things:

    a.  Commingling assets between the Funds;

    b.  Transferring properties between the Funds;

    c.  Transferring properties out of the Funds to newly formed entities for less than fair market value or for no consideration;

    d.  Using the investment funds of Plaintiffs and other members/investors to pay distributions to other members/investors in a manner consistent with a Ponzi scheme;

    e.  Making material misrepresentations and concealing material facts from Plaintiffs;

    f.  Failing to maintain appropriate internal controls and safeguards and accurate accounting;

    g.  Using assets of the Funds for the benefit of Highgrove and its principals; and

    h.  Engaging in gross mismanagement of the Funds.

148.   As a result of the acts of Highgrove and the Funds, Plaintiffs have been damaged in an amount not less than $8 million, but in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF

**(Breach of Fiduciary Duty**

**Against Defendants Highgrove and the Funds)**

149.   Plaintiffs re-assert the allegations set forth in the general allegations above, as though set forth in full herein.

150.   Highgrove and the Funds owed and still owe fiduciary duties of good faith, loyalty and care to Plaintiffs.

151.   Highgrove and the Funds breached their fiduciary duties of good faith, loyalty and care to Plaintiffs and the other members and investors in the Funds by, among other things:

> a.   Commingling assets between the Funds;
>
> b.   Transferring properties between the Funds;
>
> c.   Transferring properties out of the Funds to newly formed entities for less than fair market value or for no consideration;
>
> d.   Using the investment funds of Plaintiffs and other members/investors to pay distributions to other members/investors in a manner consistent with a Ponzi scheme;
>
> e.   Making material misrepresentations and concealing material facts from Plaintiffs;
>
> f.   Failing to maintain appropriate internal controls and safeguards and accurate accounting;
>
> g.   Using assets of the Funds for the benefit of Highgrove and its principals; and
>
> h.   Engaging in gross mismanagement of the Funds.

2856403

152.   As a result of the acts of Highgrove and the Funds in breaching their fiduciary duties, Plaintiffs have been damaged in an amount not less than $8 million, but in an amount to be proven at trial.

153.   Plaintiffs are excused from making demand on Highgrove and the Funds to file a suit against themselves for the derivative claim of breach of fiduciary duty because making such a demand for Highgrove and the Funds to sue themselves would be futile.

154.   Additionally, in engaging in the acts alleged herein, Defendants acted intentionally, willfully, wantonly and with reckless disregard of Plaintiffs' rights and with actual malice, oppression, and fraud.  As such, Defendants are subject to punitive damages based on their wrongful actions toward Plaintiffs.

### SIXTH CLAIM FOR RELIEF

**(Rescission Against Highgrove and the Funds)**

155.   Plaintiffs re-assert the allegations set forth in the general allegations above, as though set forth in full herein.

156.   Highgrove and the Funds obtained the signed subscription agreements from Plaintiffs to purchase membership interests in the Funds, and the amounts to purchase the membership interests, through fraud.  In addition, the subscription agreements are unlawful for causes which do not appear in their terms and conditions and because the public interest will be prejudiced by permitting the subscription agreements to stand.  Among other things, Plaintiffs are informed and believe, and based thereon allege, that the Funds operated in a manner consistent with a Ponzi scheme at least during 2021, commingled assets between the Funds, transferred assets out of the Funds, lacked appropriate internal controls and acted in a manner to benefit Highgrove and its principals rather than acting as a fiduciary for Plaintiffs and the other members/investors in the Funds.

157.   This Complaint provides notice of rescission promptly upon the Plaintiffs discovering the facts underlying the fraud of Highgrove and the Funds.

2856403

158.   Upon rescission, Plaintiffs demand that Highgrove and the Funds restore to Plaintiffs everything of value which they have received from Plaintiffs.

**SEVENTH CLAIM FOR RELIEF**

**(Declaratory Relief—Against All Defendants)**

159.   Plaintiffs re-assert the allegations set forth in the general allegations above, as though set forth in full herein.

160.   An actual controversy exists between the Plaintiffs, on the one hand, and Defendants, on the other hand, as to Plaintiffs' right to inspect and copy the Funds books and records based on the repeated written requests of Plaintiffs.

161.   As a result of the dispute between the Parties as heretofore set forth, an actual and judicable controversy exists between the Plaintiffs and Defendants and accordingly, a judicial determination is necessary and appropriate at this time in order that the respective rights and obligations of the Parties regarding Plaintiffs' right to access and copy the Funds' books and records may be ascertained.

**EIGHTH CLAIM FOR RELIEF**

**(Preliminary Relief Including Appointment of a Receiver, a Temporary Restraining Order, and a Preliminary Injunction**

**Against All Defendants)**

162.   Plaintiffs re-assert the allegations set forth in the general allegations above, as though set forth in full herein.

163.   Good cause exists for preliminary relief including the appointment of a receiver over the Funds and related entity CVI pursuant to Fed. R. Civ. P. 66 and LR 66-1 and for a temporary restraining order and preliminary injunction in aid of the receiver based on the following actions by Highgrove as manager of the Funds:

a.   Refusal to permit Plaintiffs access to inspect and copy the Funds' books and records after written requests notwithstanding the requirements under applicable laws and the Funds' operating agreements;

55

2856403

b.  Commingling assets between the Funds;

c.  Transferring properties between the Funds;

d.  Transferring properties out of the Funds to newly formed entities for less than fair market value or for no consideration;

e.  Using the investment funds of Plaintiffs and other members/investors to pay distributions to other members/investors in a manner consistent with a Ponzi scheme;

f.  Making material misrepresentations and concealing material facts from Plaintiffs;

g.  Failing to maintain appropriate internal controls and safeguards and accurate accounting;

h.  Using assets of the Funds for the benefit of Highgrove and its principals; and

i.  Engaging in gross mismanagement of the Funds.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

<u>As To the First Claim for Relief</u>

1.    Damages as permitted by law and in an amount to be proven at trial;

2.    Punitive damages, according to proof;

<u>As To the Second Claim for Relief</u>

3.    Damages as permitted by law and in an amount to be proven at trial;

4.    Punitive damages, according to proof;

<u>As To the Third Claim for Relief</u>

5.    Damages as permitted by law and in an amount to be proven at trial;

<u>As To the Fourth Claim for Relief</u>

6.    Damages as permitted by law and in an amount to be proven at trial;

<u>As To the Fifth Claim for Relief</u>

7.    Damages as permitted by law and in an amount to be proven at trial;

2856403

8.     Punitive damages, according to proof;

As To the Sixth Claim for Relief

9.     For rescission of Plaintiffs' subscription agreements with the Funds and a return of all amounts invested in the Funds;

As To the Seventh Claim for Relief

10.    For declaratory relief that Highgrove and the Funds must permit Plaintiffs to inspect and copy the Funds' books and records;

As To the Eighth Claim for Relief

11.    For the appointment of a receiver and a temporary restraining order and preliminary injunction in aid of the receiver;

As To All Claims for Relief

12.    The costs of suit incurred;

13.    An award of interest at the maximum legal rate;

14.    For the appointment of a receiver;

15.    For a temporary restraining order and preliminary injunction in aid of the receiver; and

16.    Such other and further relief as this Court deems just and appropriate under the circumstances.

Dated:  January 13, 2023            BG LAW LLP

By _____
    COREY R. WEBER
    RYAN F. COY
    Attorneys for Plaintiffs, Randy Firestone,
    Dmitry Radbel, Charles Evans IV, *et al.*